# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.  2:20-MJ-02711 |
| 830 East Service Avenue, Unit D, West Covina, California 91790 | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B-1*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(2)(A), (a)(5)(B) | Receipt, Distribution, and Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

CLINT WILMSEN
_____
*Applicant's signature*

Clint Wilmsen, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: <u>Los Angeles, CA</u>

_____
*Judge's signature*

Hon. Jacqueline Chooljian, United States Magistrate Judge
*Printed name and title*

AUSA: D. Diaz x0302

**<u>ATTACHMENT A-1</u>**

<u>PREMISES TO BE SEARCHED:</u>

The premises to be searched (the "SUBJECT PREMISES") is a townhouse apartment located at 830 East Service Avenue, Unit D, West Covina, California 91790.  The SUBJECT PREMISES is located within the Lafayette Parc housing complex between Towne House Way and Service Street.  830 East Service Avenue is a stand-alone, two-level structure with light grey stucco walls, dark grey roof, and white trim.  The number 830 is posted in white numbers on the front of the structure.  The 830 East Service Avenue structure contains four two-level townhouses with letters A, B, C, and D.  Unit D is on the north end of the structure. The pedestrian door to unit D is northern-most door on the front of the structure.  A white plaque with 830D in dark characters is mounted on the front pedestrian door.  The SUBJECT PREMISES also includes any persons inside SUBJECT PREMISES.

The residence is depicted below:

## Overhead View



## Front View



## <u>Unit View</u>



## <u>Front Pedestrian Door</u>



**ATTACHMENT B-1**

I.  **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography), namely:

a.    Child pornography, as defined in Title 18, United States Code, Section 2256(8).

b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in Title 18, United States Code, Section 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, in interstate commerce, including by computer, involving any visual depiction

v

of a minor engaged in sexually explicit conduct, as defined in
Title 18, United States Code, Section 2256(2)(B).

   d. Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that identify any minor visually depicted while engaging in
sexually explicit conduct, as defined in Title 18, United States
Code, Section 2256.

   e. Any and all records, documents, programs,
applications, or materials or items that are sexually arousing
to individuals who are interested in minors, but which are not
in and of themselves obscene or which do not necessarily depict
minors involved in sexually explicit conduct.  Such material is
commonly known as "child erotica" and includes written materials
dealing with child development, sex education, child
pornography, sexual abuse of children, incest, child
prostitution, missing children, investigative techniques of
child exploitation, sexual disorders, pedophilia, nudist
publications, diaries, and fantasy writings.

   f. Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that pertain to LiveMe or Mega.

   g. Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that pertain to accounts with any Internet Service Provider.

h.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

j.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

k.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar

facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated

x

techniques, including to search for known images of child
pornography.

c.   If the search team, while searching a digital
device, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that device
pending further order of the Court and shall make and retain
notes detailing how the contraband or other evidence of a crime
was encountered, including how it was immediately apparent
contraband or evidence of a crime.

d.   If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

f.   If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, with respect to an individual reasonably believed to be a user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and which falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the individual onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the individual with his/her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## <u>AFFIDAVIT</u>

I, Clint Wilmsen, being duly sworn, declare and state as
follows:

### I.  <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI"), United States Department of Justice, and
have been so employed since December 2002.  As an FBI SA, I
received training at the FBI Academy and other Law Enforcement
Training venues.  I was trained to manage and run criminal
investigations, including online investigations utilizing the
identification and research of social media along with email and
IP address tracking and analysis.  I received a Bachelor of Arts
degree in English from California State Polytechnic University,
Pomona, and a Juris Doctorate degree from the University of
California, Los Angeles.  I am currently assigned to the FBI's
Los Angeles Field Office, West Covina Resident Agency, where my
duties include the investigation of federal crimes.  During my
employment with the FBI, I have participated in numerous
investigations involving complex federal crimes, including
international investment schemes, government program fraud,
public corruption, national security, online extortion, and
child pornography.  I have conducted interviews, IP address
research and analysis, search warrant executions, evidence
collection, and evidence review in support of child pornography
investigations.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.   This affidavit is made in support of an application for warrants to search the following premises and account:

a.   The premises located at 830 East Service Avenue, Unit D, West Covina, California 91790 (the "SUBJECT PREMISES"), more fully described below and in Attachment A-1, which is attached hereto and incorporated herein by reference; and

b.   The account identified as "jonathanc678," with SID 48946852 and/or UID 919272577917517824 (the SUBJECT ACCOUNT") that is stored at the premises controlled by LiveMe America, Inc., also known as "Live.me," ("LiveMe" or the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 7998 Santa Monica Boulevard, Unit A & B, West Hollywood, CA 90046.[1]  The information to be searched is more fully described below and in Attachment A-2.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a),

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). <u>See</u> 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B-2.  Upon receipt of the information described in Section II of Attachment B-2, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B-2.  Attachments A-2 and B-2 are incorporated herein by reference.

      c.    The requested warrants seek authorization to seize evidence, fruits, and instrumentalities, as specified in Attachments B-1 and B-2, of violations of 18 U.S.C. §§ 2252A(a)(2)(A) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography).

      3.    The statements contained in this affidavit are based on, among other things: (1) information provided by FBI Special

---

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  <u>See</u> 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (<u>see</u> Attachment B-2 paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (<u>see</u> Attachment B-2 paragraph II.10.b.).

Agents; (2) written reports about this and other investigations received, directly or indirectly, from other law enforcement agents; (3) information gathered from the service of administrative subpoenas; (4) the results of physical and electronic surveillance conducted by law enforcement agents; (5) independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and (6) my experience, training and background as a Special Agent with the FBI. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and in part only. Because this affidavit is being submitted for the limited purpose of establishing probable cause, every fact known regarding this investigation is not included

### III. SUMMARY OF PROBABLE CAUSE

4. As set forth below, on December 9, 2019, an FBI Online Covert Employee ("OCE,") a member of the FBI Child Exploitation Task Force in Salt Lake City, Utah ("SLCCETF"), conducted an online undercover session on LiveMe and observed the SUBJECT ACCOUNT post a link to a folder containing videos and images of nude prepubescent children, some engaged in sexual acts with adults and/or other children. LiveMe records indicated that the SUBJECT ACCOUNT used IP addresses associated with the SUBJECT PREMISES.

### IV. DEFINITION OF TERMS

5. The following terms have the indicated meaning in this affidavit:

a.   The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in Title 18, United States Code, Section 2256.

b.   The term "computer" is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

c.   The term "email" (electronic mail) is defined as the messages sent from one person to another via a computer. Email may also include files sent as attachments to or embedded within text messages.  Email can also be sent automatically to a large number of addresses via a mailing list.

d.   The term "Internet" is defined as the worldwide network of computers—a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of computer networks, online services, and single user components.  In order to access the Internet, an individual computer or digital device user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e.   The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based.  IP allows a packet of information to travel through multiple

networks (groups of linked computers) on the way to its ultimate destination.

       f.   The term "IP Address" is defined as a unique number assigned to each computer or digital device directly connected to the Internet.  Each computer or device connected to the Internet is assigned a unique IP address while it is connected (for example, 172.191.142.150).  The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that online session.

       g.   The term "Internet Service Provider" ("ISP") is defined as a business that allows a user to dial into or link through its computers thereby allowing the user to connect to the Internet for a fee.  ISPs generally provide only an Internet connection, an electronic mail address, and maybe Internet browsing software.  A user can also connect to the Internet through a commercial online service such as AT&T, Verizon, or Time Warner Cable.  With this kind of connection, the user gets Internet access and the proprietary features offered by the online service, such as chat rooms and searchable databases.

       h.   The term "Cloud Storage" is defined as a network of online storage where data is saved in virtual storage that is hosted by third parties.  The hosting companies operate large

data centers, possibly across multiple servers.  Cloud storage
allows users to save files and data online and access their
information from anywhere using any digital device with an
Internet connection.

       i.   The terms "jpeg," "jpg," "gif," "bmp," and "art"
are defined as graphic image files, namely, pictures.

       j.   The terms "mpeg," "mpg," "mov," "avi," "rm," and
"wmv" are defined as video or movie files.  To use these video
files, one needs a personal computer or other digital device
with sufficient processor speed, internal memory, and hard disk
space to handle and play typically large video files.  One also
needs a video file viewer or client software that plays video
files.  One can download shareware or commercial video players
from numerous sites on the Internet.

### V.   BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

    6.   In my training and experience, I have learned that
providers of e-mail and/or social media services offer a variety
of online services to the public.  Providers, like the PROVIDER,
allow subscribers to obtain accounts like the SUBJECT ACCOUNT.
Subscribers obtain an account by registering with the provider.
During the registration process, providers generally ask their
subscribers to provide certain personal identifying information
when registering for an e-mail or social media account.  Such
information can include the subscriber's full name, physical

address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

7.    Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

8.    A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER.

In my training and experience, evidence of who was using an account may be found in such information.

9.   In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

10.   In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically

retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

11. I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time. Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user

of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNT with the date restriction
included in Attachment B-2 for review by the search team.

     12.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.  If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

     13.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime

involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B-2, is necessary to find all relevant evidence within the account.

14.  This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

15.  As set forth in Attachment B-2, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

///

///

///

## VI.   BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND THE USE OF LIVEME AS A MEANS FOR SHARING CHILD PORNOGRAPHY

16.   Based upon my training and experience in the investigation of child pornography and with peer-to-peer file sharing programs, and information related to me by other law enforcement officers involved in the investigation of child pornography offenses generally, I know the following information about the use of computers and child pornography.

17.   Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.   Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats.   The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

18.   Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").   Computer users frequently transfer files from one location to another, or from one digital

14

or storage device to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer and digital device users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced, transported, and stored.  For example, with the click of a button, someone trading images and videos containing child pornography with others through an online instant messaging application can be copied and put onto other digital devices or media storage devices such as external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

     19.  LiveMe America, Inc., also known as "Live.me," ("LiveMe"), a social networking and electronic communications service provider headquartered at 7998 Santa Monica Boulevard, Unit A & B, West Hollywood, CA 90046.  LiveMe is a popular free mobile application for mobile devices (i.e., smart phones,

tablets, iPods, etc.).  LiveMe can be downloaded on Android or
iOS devices.  LiveMe permits users to stream live video of
themselves to an anonymous audience of LiveMe users who can post
comments and interact with people in the video (i.e., give
instructions or commands to the user).  LiveMe also allows users
to create groups where like-minded individuals can chat and or
text with other users and post videos and/or images.  LiveMe
utilizes the internet connection through the mobile devices'
cellular data plan or through Wi-Fi to send and receive
messages, photos, videos, and other content transmitted by users
through the LiveMe application.

    20.  Each LiveMe user has the ability to create a username,
which can be changed at any time.  Every LiveMe account also has
a "SID" number, which is displayed on the profile page under the
username.  The SID number is searchable within the LiveMe
application.  The SID number will remain consistent for the
specific account even if the username changes.  In addition,
every LiveMe account has a "UID" number that is hidden from
public view and not searchable within the LiveMe application.
No matter how many times a LiveMe user may change a username,
the UID will remain consistent for a specific account.

    21.  Based on a review of company policy documents, along
with information provided by other law enforcement officers, I
know that LiveMe collects certain content created by users such

as: subscriber/registration information; user posts such as images, video, audio, and text-based communications; data associated with user posts, videos, messaging (including voice and video), or other communications; and information about how users connect to LiveMe, such as IP addresses and certain device information.  Based on other agents' experiences in similar investigations, I am aware that LiveMe maintains the content of chats, images, and videos sent between users.

22.  Providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account.  In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

23.  In some cases, users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Providers typically retain records about such

communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

24.  Finally, I am aware from my training and experience that electronic service providers such as LiveMe may report illegal conduct on their platform, specifically conduct related to the sexual exploitation of children, to the National Center for Missing and Exploited Children.  These reports, known as Cyber Tipline Reports may contain information identifying a user, images, video, and/or text posted by a user on the company's servers in violation of terms of service and the law.

25.  Based on my training and experience, I know that chat applications are often used to communicate with others, including during the commission of crimes.  In particular, I know that LiveMe has become popular with individuals who have a sexual interest in children and images of children to discuss their interest with other like-minded individuals, including to share images and videos of child pornography.

26.  Mega Ltd, also known as "Mega," is based in New Zealand and operates an encrypted, file-hosting and cloud storage service available through web-based applications and mobile applications on Windows, iOS, and Android devices.  Mega offers storage capabilities ranging from 15GB to 8TB.  Mega mobile application allows users to access and stream files from

18

a mobile device such as a phone or tablet.  Mega also provides
user controlled end-to-end encryption so intermediaries,
including Mega itself, cannot access user encryption keys or
stored data.

### VII. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Information Provided by FBI Salt Lake City About
        Activity of LiveMe Username "jonathanc678"**

27.   On December 9, 2019, as part of the investigation into
the exploitation of children online, a FBI OCE, a member of the
SLCCETF, conducted an online undercover session on LiveMe.  The
FBI OCE accessed a LiveMe group titled "BigE wr3cks," which
contained users who distributed videos and/or images of nude
prepubescent children, including infants and toddlers, engaged
in sexual acts with adults and/or other children.

28.   The FBI OCE observed that LiveMe username
"jonathanc678" with LiveMe SID 48946852 (hereinafter the
"SUBJECT ACCOUNT") posted a Mega link
https://mega.nz/#F!eyxDXKTT!5hScAGd-IUHIxoiWA1u8kw on "BigE
wr3cks."  The FBI OCE used the Mega link to access a folder
titled "Hardcore Stuff (Warning!)" which contained the following
seven folders and 43 files, totaling 7.81GB of content:
(1) "Gina 7yo,"[3] which contained nine files; (2) "Gina 7yo,"
which contained nine files; (3) "Masked girl," which contained

_____

[3] Based on my training and experience, I know that "yo" is a
common abbreviation of "years old."

19

three files; (4) "Random Photos Photos," which contained three folders and one file; (5) "Random Photos Photos," which contained three folders and 1,061 files; (6) "Tropical cuties," which contained 13 files; and (7) "Tropical cuties," which contained 14 files.  A majority of the files reviewed by the FBI OCE appeared to be videos and/or images of nude prepubescent children, some engaged in sexual acts with adults and/or other children.  The FBI OCE downloaded 21 videos from the Mega linked folder titled "Hardcore Stuff (Warning!)."  Below are descriptions of six of these videos:

  a. Video 1 (titled "2014-05 7yo girl fingered deep in both holes") appeared to depict an adult repeatedly placing his or her fingers into a prepubescent female's vagina and anus.

  b. Video 2 (titled "20160804_011702_x264") appeared to depict a prepubescent female repeatedly placing an adult erect penis into her mouth and manipulating the penis with her hand.

  c. Video 3 (titled "Gina bj & hj outside_x264") appeared to depict a prepubescent female repeatedly placing an erect adult penis into her mouth and manipulating the penis with her hand.

  d. Video 4 (titled "hard fuck of 8yo_x264") appeared to depict a prepubescent female place her mouth on an adult male's erect penis and anus.  The adult male then placed the

prepubescent female on her back and repeatedly forced his penis
into her vagina.

> e.   Video 5 (titled "PTHC - Frankporn - penetration
10yo Pussy - 2014")[4] appeared to depict an adult male repeatedly
forcing his erect penis into a prepubescent female's vagina.

> f.   Video 6 (titled "sally_tiedup_7yo") appeared to
depict a nude prepubescent female on her back with her legs
fastened to the opposite ends of a rigid pole, keeping her legs
spread.  An adult placed his or her fingers into the
prepubescent female's vagina.

> **B.   Identification of SUBJECT PREMISES**

29.   On December 10, 2019, FBI SLCCETF served an
administrative subpoena to LiveMe for information regarding the
SUBJECT ACCOUNT.  LiveMe responded to the subpoena by providing
a record indicating that the SUBJECT ACCOUNT was registered with
LiveMe on October 15, 2017, was assigned UID 919272577917517824,
and used email address jon.cedeno@aol.com.  According to the
LiveMe subpoena response, the user of the SUBJECT ACCOUNT
identified as male and utilized an iPhone 10 device.

30.   LiveMe provided IP address login information for the
SUBJECT ACCOUNT.  In December 2019, the SUBJECT ACCOUNT logged
into LiveMe from IP address 47.145.130.73.  In October and

---

[4] Based on my training and experience, I know that "PTHC" is
a common acronym for "Pre-Teen Hard Core."

November 2019, the SUBJECT ACCOUNT logged into LiveMe from IP address 47.145.133.205.  I conducted an IP address lookup using open source tools and determined that IP addresses 47.145.133.205 and 47.145.130.73 were provided by Frontier Communications.

31.  On December 12, 2019, FBI SLCCETF served an administrative subpoena to Frontier Communications for information regarding IP address 47.145.133.205.  On December 16, 2019, Frontier Communications responded to the subpoena by providing a record that from October 1, 2019, to November 30, 2019, IP address 47.145.133.205 was assigned to customer Meaylen Rodriguez with account address at the SUBJECT PREMISES.

32.  On April 14, 2020, I served an administrative subpoena to Frontier Communications for information regarding IP address 47.145.130.73.  On April 14, 2020, Frontier Communications responded to the subpoena by providing a record that from November 30, 2019, to April 13, 2020, IP address 47.145.130.73 was assigned to customer Meaylen Rodriguez with account address at the SUBJECT PREMISES.

33.  On April 10, 2020, I served an administrative subpoena to Oath Inc. for information regarding email address jon.cedeno@aol.com.  On April 11, 2020, Oath Inc. responded to the subpoena by providing a record with the following information:

      a.   Mail Name:  jon.cedeno@aol.com

      b.   Account Status:  Active

      c.   Account Created:  08/12/2011

      d.   Full Name:  Jonathan Cedeno

      e.   Country:  US

      f.   Phone:  16264357849 - Verified

34. On April 13, 2020, I conducted a search using an online tool and determined that Verizon Wireless was the service provider for telephone number 626-435-7849.

35. On April 13, 2020, I served an administrative subpoena to Verizon Wireless for information regarding telephone number 626-435-7849.  On April 14, 2020, Verizon Wireless responded to the subpoena by providing a record with the following information:

      a.   Account Name:  Meaylen Rodriguez

      b.   Effective Period:  03/07/2014 - Current

      c.   Address:  the SUBJECT PREMISES.

36. On April 14, 2020, a search was conducted for Jonathan Cedeno in the California Law Enforcement Telecommunication System with the following results:

      a.   Name:  Jonathan Martin Cedeno

      b.   California Driver License:  Y4225606

      c.   Born:  September 18, 1999

d.   Current mailing address as of July 20, 2017:  the SUBJECT PREMISES.

## VIII.   TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN

37.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that there are certain characteristics common to individuals with a sexual interest in children and images of children:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, in person, in photographs, or in other visual media; or from literature describing such activity.

b.   Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  This includes collecting images or videos traded with other like-minded individuals through online messaging applications such as LiveMe.  Individuals who have a sexual interest in children or

24

images of children oftentimes transfer, maintain, and store such materials, and use them for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

       c.   Individuals who have a sexual interest in children or images of children sometimes possess hard copies of child pornography, such as pictures, films, video tapes, magazines, negatives, photographs, and etcetera.  As digital technology has developed, individuals with a sexual interest in children or images of children have become much more likely to maintain child pornography, including materials they may have obtained from, or shared with, other individuals through chat and file-sharing applications in digital or electronic format, stored either on digital devices or in remote storage locations on the Internet.  Regardless of whether these individuals collect their child pornography in hard copy or digital format, they may maintain their child pornography for a long period of time, even years.  They usually maintain these collections in a safe, secure, and private environment, such as their homes, vehicles, or nearby, so they can view the child pornography at their leisure.  These collections are typically highly valued.

        d.    Individuals who have a sexual interest in
children or images of children also may correspond with and/or
meet others to share information and materials; rarely destroy
correspondence from other child pornography distributors/
collectors; may conceal such correspondence as they do their
sexually explicit material; and often maintain lists of names,
addresses, and telephone numbers of individuals with whom they
have been in contact and who share the same interests in child
pornography.  Additionally, individuals who receive or share
child pornography with other online users often keep backups and
copies of those materials on other digital or storage devices in
their homes, cars, or other nearby locations.

        e.    Individuals who have a sexual interest in
children or images of children prefer not to be without their
child pornography for any prolonged time period.  This behavior
has been documented by law enforcement officers involved in the
investigation of child pornography throughout the world.

    38.  Based on my training and experience, as well as my
conversations with digital forensics agents, I know that
computer files or remnants of such files can be recovered months
or even years after they have been downloaded onto a hard drive,
deleted, or viewed via computer.  Electronic files downloaded to
a hard drive can be stored for years at little to no cost.  Even
when such files have been deleted, they may be recoverable

months or years later using readily available forensic tools.
When a person "deletes" a file on a home computer, the data
contained in the file does not actually disappear; rather, that
data remains on the hard drive until it is overwritten by new
data.  Therefore, deleted files, or remnants of deleted files,
may reside in free space or slack space -- that is, in space on
the hard drive that is not allocated to an active file or that
is unused after a file has been allocated to a set block of
storage space for long periods of time before they are
overwritten.  In addition, a computer's operating system may
also keep a record of deleted data in a "swap" or "recovery"
file.  Similarly, files that have been viewed via the Internet
are automatically downloaded into a temporary Internet directory
or cache.  The browser typically maintains a fixed amount of
hard drive space devoted to these files, and the files are only
overwritten as they are replaced with more recently viewed
Internet pages.  Thus, the ability to retrieve residue of an
electronic file from a hard drive depends less on when the file
was downloaded or viewed than on a particular user's operating
system, storage capacity, and computer habits.  Because computer
evidence is recoverable after long periods of time, and because
there is probable cause to believe that persons at the SUBJECT
PREMISES were once in possession of child pornography and likely
obtained it from some as yet unidentified source, there is

27

probable cause to believe that evidence of activity related to the distribution, receipt, and possession of child pornography will be found at the SUBJECT PREMISES.

### IX.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

39.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is

not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A

single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive
could contain as many as approximately 450 full run movies or
450,000 songs.

     d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.[5]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack

---

[5] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,

31

programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly able to be segregated from the hard
drive image as a whole.  Digital data on the hard drive not
currently associated with any file can provide evidence of a
file that was once on the hard drive but has since been deleted
or edited, or of a deleted portion of a file (such as a
paragraph that has been deleted from a word processing file).
Virtual memory paging systems can leave digital data on the hard
drive that show what tasks and processes on the computer were
recently used.  Web browsers, e-mail programs, and chat programs
often store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

f.   Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device. Evidence of the absence of particular data
on a digital device is not able to be segregated from the
digital device.  Analysis of the digital device as a whole to
demonstrate the absence of particular data requires specialized
tools and a controlled laboratory environment, and can require
substantial time.

g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal

data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

39. As discussed above, based on my training and experience, and from information provided by LiveMe, I believe that digital devices used by "Jonathanc678" will be found during the search, including possibly an iPhone 10 device running an iOS operating system. Several versions of this device have either facial recognition features or fingerprint sensors, as described below.

a. I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock

34

their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID.

Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature

"Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

        d.   While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data.  The human iris, like a fingerprint, contains complex patterns that are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable

the Windows Hello features on older devices.

40.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

41.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button

38

five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.   I do not know the passcodes of the devices likely to be found during the search.

42.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require an individual

reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed in the following paragraph.

43.  For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to an individual who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant: (1) compel the use of individual's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the individual's face with his/her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

44.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

40

## X. <u>CONCLUSION</u>

40.  Based on the foregoing, there is probable cause to
believe that the evidence, fruits and instrumentalities of
violations of 18 U.S.C. §§ 2252A(a)(2)(A) (receipt and
distribution of child pornography) and 2252A(a)(5)(B)
(possession of child pornography), as described above and in
Attachments B-1 and B-2, will be found in a search of the
SUBJECT PREMISES, as described in Attachment A-1, and/or the
SUBJECT ACCOUNT, as described in Attachment A-2 of this
affidavit.


_____
Special Agent Clint Wilmsen
Federal Bureau of
Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
June, 2020.


_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

41